That so far as the rule of the maritime law which made the right to wages dependent on the earning of freight, that rule was to be abolished or so far modified as to allow him to recover wages for the period of his actual service. But the ancient rule was not to be altered to his disadvantage, and that where by that rule he was entitled not only to his wages earned but to an indemnity for the breaking up of the voyage, his rights were to be preserved intact. All the statutory provisions on this subject would thus be made consistent and harmonious. The seaman would not be entitled to wages where the voyage or vessel is lost by force majeure, except for the service already performed. But extra wages will be payable whenever the failure to earn freight or the breaking up of the voyage is caused by the acts of the master or owner. This construction harmonizes also with the principle enforced in section 4561. That section provides, as we have seen, that the seaman may be discharged, and three months' extra pay be allowed him, whenever, on the report of inspectors, the consul is satisfied that the vessel was sent to sea unprovided, in any important or essential particular "by neglect or design." This neglect or design may have been on the part of the owner or the master. In either case the extra wages are due. On the whole, my opinion is that the exceptions should be overruled.

But it is proper to observe that on the facts set forth in the libel it would seem highly probable that the respondent may set up the provisions of the act of March 3, 1851 [9 Stat. 635], in discharge of his liability. That liability is created by the general rule of the maritime law which renders the owner liable for the acts of the master, and it has been attempted in this opinion to show that that has not been altered by section 4526 of the Revised Statutes. But to this liability the maritime law attached the important qualification that the owner might discharge himself by abandoning the vessel and freight. Ord. de la Marine, liv. 2, tit. 8, art. 2. The act of March 3, 1851, adopts and incorporates into our law the same qualification. Section 3 of that act enacts that "the liability of the owner or owners of any ship for any embezzlement, etc., * * * or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned or incurred without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner or owners respectively in such ship or vessel and her freight then pending." Under this section it has been held by the supreme court that it was the intention of congress to adopt the rule of the maritime law so far as relates to the owner's liability for the torts of the master and to provide that if the vessel and freight be totally lost the owners are entirely discharged. It may be inferred, from the allegations of the libel,

that the loss of freight and vessel in the case at bar were nearly if not quite total. It is probable that the vessel was sold for not more than sufficient to pay the wages of the seamen up to the termination of the voyage. These wages have been paid. The owner's further liability must be restricted to any sum obtained on the sale, over and above the payments so made to the crew, not exceeding in amount three months' extra pay. 1 Low. 171 [Hoffman v. Yarrington, Case No. 6,580].

---

BROWN (COOPER v.). See Case No. 3,191.

---

## Case No. 1,999.

### BROWN et al. v. CORCORAN.

[5 Cranch, C. C. 610.] [1]

Circuit Court, District of Columbia. Nov. Term, 1839.

#### ACTION ON THE CASE—TRESPASS.

The reversioner cannot maintain an action upon the case against a stranger, who, by persuasion or threats, induces the tenant to attorn to a third person, it not being maliciously done.

At law. Action upon the case [by James Brown and wife against W. W. Corcoran].

The declaration averred that the east half of lot No. 2, in square No. 348, in the city of Washington, with buildings thereon, was in the possession and occupation of one Clement Woodward, as tenant thereof, to the plaintiff's wife, Sarah Jane, the reversion being still in her; that the defendant, well knowing the premises, but contriving and wrongfully and unjustly intending to injure the said Sarah Jane in her reversionary estate and interest in the said parcel of land and premises, while the same was so in possession and occupation of the said Woodward, as tenant thereof, to the said Sarah Jane, entered thereupon, and falsely and deceitfully represented &c., and threatened, &c., to dispossess the said tenant, unless he would acknowledge himself tenant of the Bank of the United States. The plaintiff then denies the truth of the representations thus made, and avers that the tenant, being deceived by the said false representations, and being also intimidated by the threats of the defendant to dispossess him as aforesaid, renounced his tenancy and holding from the said Sarah Jane, and acknowledged himself tenant to the said Bank of the United States, and refused any longer to pay rent for the said property to the said Sarah Jane.

There was a second count varying from the first in the allegations respecting the false representations and threats, but substantially like the first in all other respects. To this declaration the defendant filed a general demurrer.

[1] [Reported by Hon. William Cranch, Chief Judge.]

R. S. Coxe, for defendant.

The doctrine of attornment has nothing to do with this case. There is no injury to the freehold, or to the reversion; nor even a trespass upon the possession of the tenant. The act complained of is not averred to have been done maliciously, and there was no force or violence; nothing but a conversation between the defendant and the tenant.

R. J. Brent, for plaintiff, cited 1 Wheat. Selw. N. P. 371; 1 Saund. Pl. & Ev. 335; 1 Com. Dig. 272a, 404, 411a, No. 6; -1 Rolle, Abr. p. 108, L. 2; 2 Wheeler, Abr. 569, § 16; Egremont v. Pulman, 22 Serg. & L. 341 [22 E. C. L. 551]; 1 Com. Dig. 279, "Action," A; 2 Chit. Prec. 778, from which precedent this declaration was drawn.

THE COURT rendered judgment upon the demurrer for the defendant.

———

BROWN (CORCORAN v.). See Case No. 3,226.

BROWN (CRAIG v.). See Cases Nos. 3,326–3,330.

———

## Case No. 2,000.
### BROWN v. CURTIS.
[5 Mason, 421.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1829.

PARTNERSHIP—RIGHTS AND REMEDIES INTER SE— LIABILITY OF PARTNER HANDLING PARTNERSHIP ASSETS—BANKRUPTCY.

If a company by the articles of partnership do their business by agents, and among other officers by a treasurer, and one of the partners is appointed treasurer, and afterwards fails, owing the partnership, as treasurer, the company have a right to claim payment of the debt out of the separate estate of such partner in the hands of his assignees. And if the debt is transferred, the same right attaches to the holder.

In equity. Bill [by Alonzo Brown against George Curtis]. The facts were, that in October, 1827, John A. Wadsworth, John Welder, and Joshua B. Wood, entered into a copartnership for making steam-engines, under the firm name of the Providence Steam-Engine Manufacturing Company. The business of the partnership was managed by Wadsworth, as agent of the company, and Wood carried on during the same time the business of a broker in Providence, receiving deposits of money, &c. The articles of partnership provided for the appointment of a general agent to manage the concern, receive monies, and pay the same to the treasurer, make payments, &c. &c. They also provided for the appointment of a treasurer, who was to receive the monies of the company, and to whom the partners were to pay the installments upon the capital stock. Wood failed in May, 1828, having then in his possession, as treasurer, a balance due to the company of $1,190.98, and having made an assignment of all his estate for the benefit of his creditors to the defendant, Curtis. The company failed in August, 1828, and all their property was, with the consent of the defendant, assigned to Messrs. Stanford Newell and Cyrus Dyer, for the benefit of their creditors. In March, 1829, Messrs. Newell and Dyer assigned the debt due from Wood to the company to the plaintiff, for the consideration of $500. The property of the company is insufficient to pay their debts, and the private property of the partners is insufficient to pay their private debts. The object of the bill is, to obtain payment of, or a dividend upon, the debt, out of the separate estate of Wood, in possession of the defendant, his assignee, the assignment being, after certain preferred debts were discharged, for the equal payment of all other creditors rateably. The defendant by his answer admitted all the facts stated in the bill, except that the plaintiff was a purchaser for a valuable consideration, of which he required proof; and he denied that the plaintiff, if a purchaser, was entitled to any dividend or payment out of the separate property of Wood.

The cause was heard at this term upon the bill, answer, and depositions in the case. It was argued by R. W. Greene, for the plaintiff, and by Searle, for the defendant.

For the plaintiff were cited, 1 Atk. 227, and 11 Ves. 413.

[Decree for plaintiff.]

STORY, Circuit Justice. The fact, that there has been a good assignment of the debt to the plaintiff, is sufficiently made out by the evidence. The question then is, whether the plaintiff is entitled to the relief he prays. It is said, that he is not, against the separate creditors of Wood, entitled to a dividend out of the separate estate of Wood, because he owes the money as partner, and not as a separate concern. Now, upon that point the doctrine asserted in the cases at the bar is, that partnership debts are properly payable out of the partnership property, and separate debts out of the separate property, and until the creditors are satisfied, who have claims on the separate estate, partnership creditors shall not be admitted to touch it. Lord Hardwicke, indeed, in Ex parte Hunter, 1 Atk. 223, 227, held a broader doctrine in respect to a debt due for advances from the firm to one of the partners, and thought it ought to be paid out of the partnership funds, pari passu, with the other debts due to the creditors of the firm. It is now unnecessary to say, whether there is more good sense in that, than in the later doctrine of Lord Thurlow, which has been acted upon by Lord Eldon, that all the joint creditors shall first be paid. And it must be taken into consideration, that all these cases arose in bankruptcy, and were in the

———

[1] [Reported by William P. Mason, Esq.]